Case No. 15-11-07 and 15-17-18 consolidated. Mark Jacobs and Deborah Jacobs v. Yellow Cab Affiliation, Inc. Could all of the attorneys that are going to actually argue today step up to the podium and identify yourselves for the record. I'm Kevin Butler on behalf of Cornelius Vigou, the co-defendant appellant. Jim Tomasik on behalf of Mark and Deborah Jacobs v. Appellees. Good morning, Your Honors. Rick Godfrey on behalf of Yellow Cab Affiliation. All right. Before we proceed, I will advise all of you that each side will have approximately 20 minutes. Now, Godfrey and Mr. Butler, some of the issues are overlapping. Have you talked about dividing the time? Yes. I was going to go first, but yes. I'll go first. I'm going to take seven minutes. You can take the remainder and I'll reserve some time for rebuttal. All right. And we will not duplicate issues, Your Honor.  Thank you, Your Honor. Certainly. You may step up then and proceed. Good morning and may it please the Court. I'm Kevin Butler and I represent Cornelius Vigou, the appellant. I hope to discuss this morning, first, why the trial court's refusal to require a special finding violated Section 2-1108 of the Illinois Code of Procedure, then why the introduction of certain evidence and instructions substantially prejudiced the defendant requiring a new trial, and lastly, why the award of damages on the loss of consortium claim was clearly excessive. But I want to begin first with what I believe is the most decisive issue, and that is in regards to the special interrogatory. We submit that the judgment entered in this case is void and requires the case to be remanded for new trial because the refusal of the lower court to require a special finding violated the mandatory statutory command of Section 2-1108 and interfered with Mr. Vigou's substantive rights. Pursuant to the Code, the jury must be required by the court to make a special finding when a party invokes his right by requesting a finding on any material fact. This mandatory command recognizes that a party has a substantive right to test the verdict through the finding, and Section 2-1108 just is a mere regulation of this right. The regulation of the right has been held declarative of the common law, and it should therefore be construed liberally in favor of the right, and courts should be inclined to protect and enforce the right. And just so we're clear, you're not actually quarreling with the first interrogatory that you initially submitted? Well, I think both interrogatories. There were three interrogatories submitted, one which isn't the subject of appeal. There's a second interrogatory that was refused, and then there was a third interrogatory that was not. So you are seriously questioning? I think the second one is the most clear interrogatory, but I think they both meet the test. Was there any directive from the court or any opportunity from the trial court for the parties to resubmit the interrogatory in a different form? Well, there was no direction from the court that it should be in a different form. They did say go ahead and try again if you want to, and I think that's improper. And did you want to, or you chose not to? Well, I think both interrogatories. There comes a point in time when it becomes fruitless to continue to submit the same question over and over again. And when the court knows exactly what we're getting at and says try again, try again, you didn't say the magic words that I prefer. And the question is, is this really a matter of preference, or is it a matter that the interrogatory has to permit for one answer only? I agree. It has to check the verdict. There are limitations on the right. It must check the verdict, it must be supported by the evidence, and it must be an ultimate fact. And this interrogatory does this. What do you say to the argument that referring to plaintiff's actions on the night of the accident is just too vague, that you should have been more specific to say what I assume you were referring to was the plaintiff's late notice to the cab driver of the Ogden exit? Why didn't you say that in the interrogatory? The objection to the interrogatory was that it wasn't defined as the time and place. It was. There is a definition in the jury instructions about the time and the place. If you look at the 2101 instruction, which the court in Snyder said that's what you're supposed to look at to define these collective terms, like conduct or actions or driving conduct, there's all sorts of cases that say you look to the jury instructions, and in the jury instructions in this case, let me read it to you. The actions you're referring to are belatedly obstructing the driver and shouting in a manner that startled the driver immediately before the collision. We're talking about the time and place of the collision in both of these actions that are described in the 21 interrogatory, which is where you look. You cannot say it's a defect. You can say that I prefer other language, but that does not eliminate the right to the finding. And if there's an issue with the language of the interrogatory, if it's preferred by one party that it says something else or it's preferred by the judge that it says something else, then the court under the statute has a duty to correct the consenting. The rights of the party does not depend upon the preference of the personality of the judge holding the state office. It's dependent upon the law. This statute requires that the issue be decided as a matter of law, not as a matter of highest form of clarity or a preference for this word over that. And so if you look at Norton v. City of Chicago, they said you shouldn't use this language unless the case is complex. You shouldn't use this time and space language unless the case is complex. Whereas the inward event is so substantially separated in time from the alleged negligent act, and that's not the case here. Here this happened instantly. The shouting, the instruction from the driver, this happened right at the time of the action. Let me ask you this. Sorry to interrupt you. What about the jury's verdict that there was a contributory negligence to the tune of I think it was 12 percent? Correct. Doesn't that indicate that even had you gotten the jury instruction written the way you wanted and submitted it to the jury that they would not have agreed with it? Doesn't that suggest that they certainly did not think the plaintiff's verdict was the sole proximate cause? Well, the court in standard said that that's not the issue. The issue isn't that the comparative fault jury verdict, that they're covering the same issue. The whole point is to check that verdict. In fact, the Illinois Supreme Court in Elvis v. Rybar, which created the whole comparative fault issue, talked about the necessity of using special interrogatories when the jury is charged with apportioning fault. They said this is the whole reason for comparative fault. Why it's justified in this state is because the judge can give special interrogatories, and they should. The Supreme Court said they should give you special interrogatories because they focus the attention of the juror. And so the fact that this general verdict, though itemized, contains an apportion of fault, does not mean that the jury was allowed to focus their attention on the question. That's the right at stake here, and it is a substantive right. And you're arguing, are you, that because it's a question of law that we're reviewing this de novo as opposed to any other standard of review? Well, there's a couple sections of the statute, and they all require different standards of review. The first section of whether there is a right, and that is decided as a matter of law. And we could agree that as a matter of law, there's a right as long as... As long as it's requested in proper manner. So how are we then reviewing the court's refusal to at least give you the second proposed interrogatory? And is that de novo, or is that an abuse of discretion? No, it's a de novo. So it isn't. You are saying it's a de novo review. Absolutely. The statute tells you that. Refusing or submitting... No, I'm not talking about that. I'm talking about the form that was submitted. Did the court say the form was not proper? The court said that the question presented was nebulous. So how are we reviewing that? Are we reviewing it as you're saying de novo, or are we reviewing it for an abuse of discretion? Well, I think it's a two-step process, like you said. There's a first step, is whether it checks the verdict. Whether the interrogatory is so confusing that it would not serve as mutually exclusive of a general verdict. It meets that task. There's other questions that are reviewed as an abuse of discretion in the form the judge presents it, but that is a directive to the judge, not to the party. The party is not in charge of the language that is ultimately submitted. In order to request a right, he presents the question to the judge, and the judge looks at a three-part inquiry. Whether it's a maternal effect, which is clearly the case here. Whether there's evidence to support it, which there is here. And third, whether it's in proper form. I'm just saying, you have to ask for one answer and one answer only. True? Yes. So there has to be a mutual exclusivity between the, you know, that's how these tests are decided whether the right has been asserted, is whether it's so closely worded that it's mutually exclusive of the verdict. Now, if there's the likelihood of confusion or some other claimed defect like that, that's reviewed for a... May I interrupt you? What exactly was it, what did the cab driver say that Mr. Jacobs said to him so that he... Well, he screamed at him to get off right at the last minute. To get off at this exit, something like that? Right. Could you have provided an interrogatory that would have asked that question when Mr. Jacobs told the driver to get off at this exit? Was that the sole proximate cause? Could you have phrased it like that? I think you could. There's an endless amount of ways that it could be phrased. Yes, that could be phrased. But is it issue was whether that remark to get off here was the sole proximate cause? No, there were two actions here that are alleged in the 21 interrogatory where the court says the jury logically looks to supply the definition of the collective term. And if you're going to start... there are cases where there's 50 elevations of negligence. How long is that question going to be? And there's a rule here that these things shouldn't be repetitive. You shouldn't be repeating yourself. And if you're going to start repeating the elevations in the jury instructions that you use in the special interrogatory itself, you're being repetitive, and that's likely to cause contingent. There are many ways to approach this thing, but the question is does it check the verdict? And it does. It does check the verdict. When the trial court said, give me an opportunity to reframe the special interrogatory, and notwithstanding the fact that you don't believe that you have to try and try and try again, was there at least one trial again to reframe it or to reframe it to make it more specific? He said, I'm not going to rule against you ever presenting an interrogatory, but you can try again if you want to. Now, that's not the issue here. The question is whether the interrogatory was proper. And if it was proper, there's no discretion there to say, try again because I don't like it. In fact, the court in Hills of Fayette County said they can't do that. They can't sit there and say, I don't like that, try again. They've got to be specific as to what the defect is, so the verdict has the right to violate in accordance with the court's direction or the defendant's direction. But the point is you cannot sit there with a proper interrogatory and refuse it. This is a substance of life, and the information is supposed to be in favor of the right, not to resist it by saying, I don't think there's something wrong with it, but try again. And if you get the magic words that I'm thinking of, it's good, and you can enforce your right. It's a right. It's a right that the Supreme Court says was recognized as common law. It's a right that's a substantive right. It's a right that the courts have said cannot be infringed by a procedural statute. And I think the posture of the court here is to resist the strike, and I think that's improper. And I think when you get to that second stage of choosing the language of the interrogatory after the verdict has been properly asserted, you have used your discretion that's been granted to you by the legislature in forming the language of the interrogatory. So as I said, let me hold you up for one second. I want to go back to this finding the jury made on contributory negligence. I asked you about it before you said Snyder said we can't do that. I understand that Snyder and other cases talk about the fact that the specific interrogatory is meant to test the general verdict, of course, but this was a little bit more of a specific finding than just a general verdict. This was a finding of contributory negligence. They took into account the plaintiff's conduct. They assessed a percentage of value to the amount that his negligence contributed to this injury. They didn't use the word proximate cause. I think it said proximately contributed. Maybe we can argue about whether that's a distinction that matters. But the jury actually did take all this into account and said we think that he was only responsible 12%. That being the case, is there any reason to believe that even had you been allowed to submit this, that it would have made a difference? Yeah, I mean, I think the courts have said that special interrogatory does focus the jury's deliberations on a specific issue. I agree, but doesn't it seem pretty specific when they were focused all the way down to 12%? That's pretty focused. That's not just refined for the plaintiff or refined for the defendant. Sure. I mean, the plaintiff was 12% responsible. I think that's an argument that's been addressed. The exact same issues appeared in Snyder. It was contributory negligence. Was there a fixing of contributory negligence, a finding of contributory negligence in Snyder? I just don't remember. You know, I don't remember. They refused as well. So, you know, I don't think they discussed it in their language of the opinion. Okay. I think there was, I think it was reduced. I think it was a million-dollar verdict that was reduced. I'm not sure. I'll check with them before I judge. That's fine. But, again, this is the specific guideline that the Supreme Court says when there's comparative fault, you should. In any comparative fault case, you're going to assign language. And there's no court that's ever held that you're not entitled to a, your right to a special finding is extinguished when there's comparative fault. No case has ever said that. And if she's going to say that, you'd be first. I have some, just say something. I thought there was, well, whatever. If you want to. No, go ahead. I'm sorry. Please. I thought you had some other issues you were going to discuss. Yeah. Sure. I just didn't want to go over time. The next thing I wanted to talk about would be. Briefly cover them. I'll talk briefly about the evidentiary issues in the case. And the first is with the habit testimony. There was careful habit testimony introduced in this case over the objections of the defendants that the plaintiff was a man of careful habits. And that he was a man who, as well as testified, she observed being careful in his everyday activities. This was objected to. The court told the jury that the question shall stand. There were some other questions that the court threw out, and directly the jury did disregard. But these two issues were then used to negate the testimony of Mitchell Zidu, who testified as to what occurred in the cab. And this testimony, which was improper in its nature, it was general. I don't think there's anybody who's going to argue that this is proper careful habits testimony. This careful habits testimony was about just the general nature of the man. Right? And it's not about a response to a particular situation that is semi-automatic that the law requires for habit testimony. The other issue is we were allowed to introduce evidence to negate that. They didn't allow seatbelts. There are questions regarding the plaintiff's failure to use the seatbelt. This is just an incredible inequity in this case. And I think that if you're allowing one side to introduce evidence of careful habits to negate the critical issues in the case, the issues that the defendant is putting forward as his theory of the case about what happened in that cab, what caused the accident, and you're using habit testimony to defeat that, and it's improper, and then you're not allowing the defendant to introduce evidence that is relevant about careful habits, that he wasn't using the seatbelt around that day, then it's just a gross inequity. The statute that applies to wearing the seatbelts, the 12-603.1 that they cited in the brief, that applies to situations where the seatbelt is used to prove negligence, not to prove the conduct of a person in a particular situation. And so that statute should not apply to bar the use of the seatbelt testimony in this case because then you're reading that statute as unconstitutional. What would be the relevance from your viewpoint of him not wearing a seatbelt, to say that generally he's not careful? If that's allowed on one side, it should be allowed on the other side, and that's exactly right. In fact, during the course of the trial, Mr. Clifford told the court, that's why I want to use it. I want to show that he's generally careful and would never have done anything negligent. Well, the plaintiff was presented with a somewhat difficult situation here where the plaintiff didn't remember what happened. That's true. And their theory of the case, at least probably more relevant to YCA than to your client, was there's a specific reason we took this cap because we thought it was a yellow cap. And since he couldn't remember actually making that decision at that point in time, they were trying to prove it another way by showing that he generally has this concern about yellow caps. And I don't follow him with trying to do that. I mean, you've got to do it the proper way. And it's got to be evidence that is particular about the particular statute, particular situation, not just general information. He's careful all the time. That's not right. That's unfair. That's misleading the jury when you're not allowing them to hear the evidence on the contrary side that he wasn't wearing a seatbelt. Well, couldn't a trial court have looked at that and said, well, the seatbelt thing is a little more on the nose, and it could be interpreted by the jury. It could get the jury thinking down the road the plaintiff was negligent, contributorily negligent for not wearing a seatbelt. Yeah, but this is an opening the door situation. That's what they argued. You testify to careful habits improperly, and we have to have the, you know, this is a big inequity here. You're allowing a false impression to go to the jury that he was careful inside that cab when he wasn't wearing a seatbelt. And that's just improper. That's exactly what he was careful. Inside the cab? Yeah. That's what the allegation were, that inside the cab he was being, he was yelling, and I'm not going to go through the list of things. No, right. But here we have a situation where he's also not wearing a seatbelt inside that cab. And this is the inequity. The seatbelt issue tends to disprove what they're asserting through this improper habit testimony. And so that would, and quickly, if I had any time left, to go to the issue of the expert testimony with regard to speed. We have to. I'm not sure you're talking about remissness, or if that was the other thing you mentioned. Did I misspeak? I can talk to you about remissness. No, I just, all right, go ahead. Quickly, the reconstruction testimony. It was objected to on the grounds that there was two witnesses who testified consistently about the speed at the time prior to the accident. And there was no silence offered in contradiction to this by the expert. The court allowed him to testify that he didn't believe the witnesses and that the jury should add 10 miles an hour to their estimation of speed because everybody lies. And then in his opinion, people on that part of the roadway usually travel at 70 miles an hour. So that's how fast they were traveling. That is completely out, you know, beyond the pale of what is proper expert evidence. And, you know, again, it goes to a critical issue about one of the allegations in the case of the plaintiff of the cause of the accident was speeding. And here we have an expert saying he was going 10 miles, he was going 12 miles over if he should have been to be able to maneuver the area safely. And that's based on absolute anecdotal speculative evidence. Did the expert testify to more than simply the speed at which they were traveling? Also, expert testimony with respect to the, I guess, the trajectory of the vehicle when it's airborne and striking the wall as well? Yeah, there was a lot. And that was not what the motion in the memorandum was about. It was about the specific issue of the speed at the time of the accident. And, you know, this is the issue that was raised and was presented to the jury in the jury instructions was the speed of the vehicle at the time right before the accident. And then, you know, there's no science behind this testimony. It should have been excluded. And it goes just like the habit test, it goes to a critical issue in the case, that allegation, and it's improper. And lastly, I'll just speak about the lawsuit consortium. They were there on the lawsuit consortium. All the evidence in this case, there was evidence in this case that Mr. Jacobs was a changed person. There was not evidence about a damage to the marriage. There was evidence that they still had a... There wasn't evidence about damage to the marriage? To the marriage. There wasn't? You're saying there wasn't. There was very little. There was very little. All right. You think that's an accurate portrayal of the record? Well, I think, yeah, I think it is. I mean, I think that what they described is... Going from having a spouse who is a high-powered attorney, bright, intelligent, a father. No, I'm not talking about the father now, though. Okay. The change in the marriage, the wife became basically a caregiver? That's double recovery. That's double recovery. You're talking about things that are double... He was awarded $15 million for the economic damage. What do you think that the... How is the award excessive as to his spouse? Well, as they argued in the post-trial motions, the justification for the $5 million award of loss of consortium was because he made a lot of money. And that's not what loss of consortium is. Loss of consortium is damage to the marital relationship. Your interpretation is there was no damage to the marital relationship. I'm not saying no damage to the marital relationship. Does the jury generally get to measure that, though, if there is damage? Well, there's no test for that. Yes, it's wrapped up to the jury, but there's not a clearly excessive award. I don't think there's ever been an award this high, ever, in the state of Illinois. You mean for loss of consortium? For loss of consortium. We are clearly getting into an area where they are awarding money based on the wealth, about the income of the husband, and that if he's worth $22 million to him, it should be proportionate to her. That is all double recovery. What we're talking about here is was there a change in the marital relationship? And they testified, my marriage is better than ever. So how would that result in? Let's be more specific than that. What I understand was the evidence was that there was less intimacy, that they didn't usually sleep together anymore. Sometimes. She said sometimes. I didn't think of it strictly. Okay. That was because of Sloan. And the Sloan, the expert testimony was on Sloan was that he had a deviated septum that could have caused the sleep apnea. And the sleep apnea could be caused by the deviated septum. The expert, their own expert couldn't say that that was caused by the accident. Okay. So how is that proved? And then beyond that, I think what I got from it was that he was just a different person. It just sort of fundamentally affected the relationship. People change all the time, but that doesn't mean that the relationship and the marriage is damaged. I mean, we're talking about the happiness in the marriage. Well, let's just say I'm happier than ever. My marriage is better than it's ever been. He used to be funny. He's still funny. He used to be nice. He's still nice. What is the change? The change is that there's all economic damage. Right? That's what they're complaining about. And I'm not saying, you know, there's a common reform that is a vicious attack. I wish these people well. I'm not vicious. I'm attacking the judgment. And, you know, I think it's clearly excessive. I don't know. I may be wrong, but I think the largest award ever by millions. All right. I need a minute. You'll have some time for rebuttal. Thanks. All right. Captain. Thank you, Your Honor. May it please the court. The court knows I'm Rick Geithner. I represent YCA. This case went to trial, and the trial was conducted based upon a fundamental legal error. Everything that took place after a fundamental legal error was made is derived from it. And the question for this court to decide at the threshold, which determines and dictates the outcome of this appeal from YCA's perspective, is a simple, similar question, but one that gets to the heart of the matter. May a person or a business such as YCA be held vicariously liable at common law for a claim of apparent authority on the basis of conduct that is mandated by statute or code? Every single fact, every single argument that was made in opposition to our appeal and that was made below is based upon facts that were mandated and conduct that was mandated by the municipal code. To affirm this judgment, this court must overrule, technically it cannot overrule, so it must ignore, three decisions of the Illinois Supreme Court and four decisions of this court. Lanier, Price v. Stroll Morris, and Jarvis v. South Oak Park, South Oak Dodge. All cases which hold the common-sense proposition, which is true in every jurisdiction in our country at least, that conduct complied with or mandated by law cannot become the basis for common law liability. O'Banner and the Supreme Court case. Knapp and Daniels and Olivera Brooks of this court. And why is that? Why is this a bedrock principle of apparent agency and agency in general? Why? Because it turns upon volitional conduct. As the restatement says so well. One can be held accountable and responsible in the law for one's own conduct that one can volitionally engage in or enter into, to do or not to. One cannot be held liable. Do you by any chance know if these code regulations that you rely on were in effect when YCA was created as a company? That may be an unfair question. It's not unfair. 1997, and the amicus brief actually outlines this in more detail than we did. In 1997, the opportunity to create affiliations in the code was created. And so there was a reorganization, as I understand it, in the taxi cab industry at that time. And YCA took advantage of that and the affiliation was created around that time, as I understand it. And what was the purpose of that? This is interesting. The legislative history here is municipal code from the city of Chicago.  One of which was to enhance the enforceability, enforcement by the city agencies in terms of tracking who's got which cabs. Another was centralization so that from an insurance perspective, people would, you know, an affiliate, someone who chooses to affiliate, and remember YCA cannot turn down someone who wants to affiliate with it. Affiliations can have better insurance and can work through insurance and there's efficiencies advantages. But I can't tell you because I can't say that there's a body of legislative history that we can all trust. No, but part of it is to regulate the cabs. It's entirely to regulate. It's comprehensive regulation. All right. But why the change is what it did before, that was a question I thought that Judge Ellis was asking, and I can't address that any more than I have. Under those regulations, was it required that yellow cab have on this particular cab the logo? It's not just that it was required. It was? Yes, it was required, but it's more than that. The provision of the municipal code requires that the logo be used. There is a testimony which the jury was not allowed to hear. Yes. It's provision 9-112-390, which is at A39. A39? Yes. Some taxi cabs will have the public passenger vehicle license number, the cab's name, and telephone number painted in one of the following locations. The center of the main panel of the rear doors of the vehicle or on the rear panels of the vehicle if an advertising permit has been issued for the rear door. If the cabin is affiliated or identified with any affiliation as described in section 9-112-070, the affiliation's color scheme, trade name, or emblem, i.e., now there's a question about logo, emblem, and telephone number, shall be substituted. All right. So your position is that the emblem is required? Yes. All right. And, in fact, to the regs, I mean, obviously the regs did not require yellow cab affiliations to use a logo that looked almost identical to the yellow cab company logo. I mean, obviously it didn't. YCA chose its logo. YCA chose the logo, but it was obligated to choose color scheme, have an emblem. It had identification. Remember, this is for city enforcement purposes. They wanted to be able to identify it. The fact that YCA chose a logo is irrelevant. The fact is they had to choose a logo. They had to choose an emblem. It didn't have to choose a color. It didn't have to choose. The company did not have to choose the logo that it chose. I mean, I think that's kind of what the point is getting at here, right? YCA chose a logo so that when you were required to put it on, it would look like the yellow cab. And that's at least the argument, frankly. But that's an argument with no legal significance. The fact is it was mandated to choose. Their argument is that they weren't required by ordinance to use or choose the yellow cab emblem or logo that they had on this cab. I don't agree with that, number one. And number two, the Daniels court didn't agree with that. Well, the Daniels court was not about a parent agency at all. It was all about a parent agency. It was about actually. I understand what the court ruled on. But you cannot have an apparent agent if you cannot have an actual agent. The Daniels court, by definition. What's that now? I'll tell you why. You can't have an apparent agent if you don't have an actual agent. In this case, in Daniels, the Daniels held. No, that's correct. In Daniels, the court held that the conduct which they claimed, the plaintiff claimed, was the basis for actual agency was conduct mandated by the code. The yellow scheme, the logo, et cetera. And the court said that cannot become the basis for an agency relationship. Period. In this case. Not in general. But in this case. But in an actual agency situation, you can't have an independent contractor relationship, can you? No. Not in an actual agency situation. But you can when we're talking about apparent agent. Of course. But not in that context. I don't know that this isn't really a discussion of apples and oranges when you say that, you said it just a few minutes ago. And that's what I said. All right. So you tell us how you can, you must have an actual agent in this case. The conduct. In order to get to apparent agent. The conduct. As a general proposition, Your Honor is entirely correct that one can have a situation where someone can be an apparent agent where there's no actual agent. There's no question about that. Okay. But here, what the Daniels court held was that because the conduct at issue was mandated by the code, the very conduct of which the plaintiffs are complaining of here, there can be no actual agency. That same conduct. And why does it say there can be no actual agency? Because it was mandated by law. It was mandated by law. What is the value of YCA's creativity, if you will, in the design of this logo? And the parties note that the very design of the logo and some of the smaller text at the bottom of the logo was, in fact, designed to entice or to give the impression that this is a particular type of cab company. So what was the? The code requires that an affiliation have a color scheme, that it have an emblem. These are mandatory requirements by code. Well, why did it have to be this particular emblem? Well, we'd be sure to put another emblem. Under their argument, it's the fact that we had a color scheme and that we had a logo. I mean, the case law, and Amicus points this out, we point this out, the case law of logos is the fact that a logo does not create an apparent agency or apparent authority. Not simply, no. Right. But let's go back to the fundamental issue. Daniels said this conduct, this conduct in which they rely upon for apparent agency was conduct mandated by law. Apparent agency? No, in actual agency. What Daniels said is in the actual agency conduct, this cannot give rise to a claim because it's mandated by law. But isn't the plaintiff's theory here that you were, that YCA was strategic, clever, manipulative, used good words or bad words, but they were, they knew what they were doing when they chose the logo. They knew that that logo was, that they would be able to say, we have to put this on the cabs. The city regs say that we do. So let's do a logo that looks just like a yellow cab company. Logo. That's their argument. And the reality is it was required by law that they have a color scheme. But not that logo. Not that logo. They could have had a logo, they could pick any logo they want. It looks almost identical, wouldn't you agree, almost identical to a yellow cab logo. It has a little word affiliation on the bottom. That's the only difference, I think. I understand the point. The point is it's still conduct that is sanctioned and required by law. And the question is, by doing so, can you give rise to common law liability? Now the vice here is, let's assume that you disagree with me about my reading of Daniels, that the conduct at issue, legally mandated, can nevertheless give rise to an apparent agent relationship. Let's assume that you've rejected that position. You say this isn't conduct required by law because they made a choice, a choice that the code required them to make. Now let's talk about the jury instructions, because remember I said this error infected everything. The first jury instruction had three elements. Element one, plaintiff must prove that YCA held itself out as a provider of taxicab services. That's a per se error. That's a directed verdict. Why? This is a parent agency, not actual agency. And under a parent agency, and there will be a banner case, and under a employee case, it should have said, plaintiff must prove that the defendant held another, easy way to go out. That's why you have a license card. The license card, by the way, is notice. That's required by the code to notify a passenger as to who the owner actually is. So they've melded, in the jury instructions, they've melded a parent agency through the actual agency. Did you argue or did you present another instruction? Yes. It's a record of 1236. What we said was, look at Ploy. Ploy gives the basic instruction. And the court repeats yours. The court repeats that, yes. Second point, second instruction that was given on this. The court said, plaintiff must prove that he neither knew nor should have known that Cornelius Evangelou was not an employee of Yellow Cab Affiliation. It's not a parent authority. It's actual agency. Plaintiff, where it should have been under Ploy, and under a banner list, plaintiff must prove based on the actions of the defendant and third party that plaintiff knew and concluded that an agency relationship existed. Third instruction that was given. Plaintiff must prove that he did not choose Cornelius Evangelou but relied upon Yellow Cab Affiliation to provide taxicab services. Now, here's this is according to Ploy, Halloway, or Brooks. Plaintiff must prove that he relied on an agent's parent authority to his detriment. The instructions are about, in a sense, actual agency. Now, they're based upon the Gilbert case. And what took place in the Gilbert, as this court knows from the Gilbert decision as well, what took place was a special rule under 105.10 for medical malpractice in hospital situations. And the reason that your is important here is the following. You're revisiting Gilbert because after Gilbert was decided, various circuit courts and various courts of appeal were incorporating the O'Banner decision on apparent agency principles in general into Gilbert. And the Supreme Court said, no, you can't do that. Hospital situations and hospital settings are fundamentally different. What's taking place in his case is just the opposite. Plaintiffs are attempting, they persuaded the trial court judge, to incorporate Gilbert's into O'Banner. So that all the basic requirements about apparent agency, so Justice McBride, you asked the question about Daniels and apparent agency. If apparent agency was not decided de facto by the Daniels decision, then how is it that you get a jury instruction that says, plaintiff must prove YCA held a self-honored provider of taxicab services? It's not about whether YCA held itself out as, it's about whether YCA held EVA out as an apparent agent. Because as a matter of law, there was no agency. Was the jury informed that the cab was owned by the brother of the driver? Yes, but you know, the jury, and this is one of the oddities of this case, the jury was asked a question. The jury asked a question, and the question, right? Refresh our memory. Well, the jury said, basically, did the cab owner have to join an affiliation? The jury got it. The jury wanted to understand the relationship. I don't know, someone asked the question. Jurors are pretty smart, in my experience. But let me go back to something that I think I would wish the court to focus on here, to illustrate the twin errors, both the threshold error and then the follow-on error with instructions. Excuse me just for one moment. Were the IPI instructions, were the apparent agency instructions non-IPI? They're non-IPI because the IPI, the only IPI instructions that exist on a parent agency come from Gilbert, and the Supreme Court bill says that's for hospitals, medical malpractice. I thought that those IPIs refer back to this particular instruction. Then there's no IPI in general? No, there don't. Do they say look at 1-0-whatever-it-was? I'm not sure I followed the question. The IPI instructions, you're saying don't have any reference to anywhere else in the IPIs? No. I'm not saying that. What I'm saying is that there is no general parent agency instruction, and that provision refers to IPI 105.10, and the Supreme Court notes for 105.10 make clear, and the York case makes clear that that is limited to the medical malpractice hospital situation because otherwise O'Banner is not good law, otherwise Oliver and Brooks is not good law, otherwise Ploy is not good law, but we know that they are good law. They're not reversed and they're still the law of the state. So the comments are important. The comments, I thought, are what direct you to the instructions that the Childhood used in this case. The comments simply refers you to their saying, see, it doesn't say you're supposed to use it one way or the other. In the comments, the Supreme Court notes the IPI 105.10 make clear that it is hospital and bed mal, but set that aside. York v. Rochefort v. Turahan, that Supreme Court case distinguishes between, and discusses the distinction between O'Banner on the one hand, which is general parent authority in the McDonald's case, and Gilbert on the other hand, and says they're different. But there are no IPI instructions. That is correct. There are no IPI instructions on this point. Now... But the comments through the jury instruction do permit the court to modify the instructions to tailor them to the particular facts of the case. Isn't that what happened here? Not at all, because they didn't use their parent agency instruction. And why do we know that? I review the instructions, they know, but you know they won summary judgment, right? They defeated summary judgment. Plaintiffs did. So take a look at A359 of the appendix, which is the page on which they defeated summary judgment. But no opinion. And the court sets forth the standard by which you measure a parent agency. And let me read this carefully if I could, because it's important, because this is not what the jury instruction said. A parent agency, also known as a parent authority, is based on the principles of estoppel, and it exists when the principal creates a reasonable impression that his agent has authority to act, citing O'Banner. The doctrine recognizes that a principal will be bound not only by that authority, which he actually gives to another, but also by the authority which he appears to give. In order for a plaintiff to prove a parent agency, he must show, one, that the principal held the agent out as possessing the authority to act on its behalf or knowingly acquiescing in the agent's exercise of authority. Two, based on these actions, the third person reasonably concluded that an agency relationship existed. And three, the third person relied on the agency to her detriment. Now, that's what the court held, citing the proper standard from the Supreme Court's decision in November. What were the instructions given? Did the first instruction given say that the principal held the agent out as possessing the authority? No, it said, plaintiff must prove that YTA held itself out. Instruction two. Did the court say, as it did on summary judgment, that based on these actions, the third person reasonably concluded that an agency relationship existed? No, the court said, plaintiff must prove that he neither knew nor should have known that Cornelius Eziagu was not an employee. That has nothing to do with a parent agency. Three, the court on summary judgment said the third person relied on the agency's parent authority to her detriment, citing all of their books. Is that what the jury was instructed? No. The jury was instructed, plaintiff must prove that he did not choose Cornelius Eziagu or relied upon Yellow Cabin Foundation to provide taxicab services. These instructions are actual agency respondent superior instructions based on a modification of Gilbert. They have nothing to do with a parent agency authority. Otherwise, you cannot square these instructions with Oliver Brooks, with Troy, or the O'Bannon decision.  One is, every piece of evidence, whether it's the code, selection on the yellow color, or whether it's an emblem which is permitted by the code, or whether it's an injury instruction, in effect, YTA is being held liable for having complied with the code. So when we're asked, well, they chose the emblem, or they chose the logo, the code authorized them and mandated that they do so. The form of the law was irrelevant. They were obligated to do so. Were they obligated, though, to pick and choose the emblem that they wanted? If I'm told across the street, under order of law, like the Knapp case, the child is told to move the car. Was that in the parent agency case? That was in it. No, that was not. The point is that if the court is wanting... We're saying you didn't have to... The plaintiffs are saying, did you need to pick a logo, that to all intents and purposes, a person in Chicago standing on a street corner looking for a cat is going to think it's a yellow cat. Logo. Right. You had to do a logo. But you didn't have to do that one. Something about that color scheme that came into the evidence here about how they came up with this particular yellow? Well, there was argument about it. Did they have to pick that? No, they could have picked green. They could have picked blue. The point, though, is it is an artificial distinction under the law, as Smith said, that won the state. Because this is a state action. The state says you must pick a color. You pick a color. And then the state says, okay, having complied with the state conduct of picking a color, you're now going to be held liable for creating a parent agency because you picked that color as compared to this color or as compared to another color. Every single fact that they point out, and that's the reason we cite Daniels. That's why, given Daniels' holding, what Daniels' specificity is, this is the conduct that was mandated by the code. How can the same conduct mandated by the code in Daniels, depriving Daniels of an agency relationship because conduct compliant with the law cannot give rise to common law liability, how can that same code compliant, code mandated conduct give rise to a parent agency liability? Because it is the rule. This isn't really your position that there can't be any apparent agency in this case because of the statute, is it? Yes, as interpreted by Daniels to the facts. So do you take the position that there could never be the creation of an apparent agency situation because of the code? No, it's the conduct. Remember, the code and apparent agency turns first and foremost upon volitional conduct of the defendant, right? Absent volitional conduct, there cannot, by definition, as a matter of law, be an apparent agency relationship. You're really saying there's no volitional conduct at all? Precisely. We're saying that all the conduct is a matter of law based upon Daniels and based upon the code provisions. That's what we're saying. But wouldn't you also have to establish that there was no choice whatsoever involved in the selection and use of this emblem? No, I don't think that the law and state action is so crappy. But you're arguing, aren't you, that the statute required them to select and use this and only this? No. Didn't the charge just say that he wasn't going to allow the jury to go off on that sort of theory? The charge has kept almost all evidence about the codal requirements out, which we think is a fundamental problem. We've already commented on that. The problem here is this is a distinction with no meaning under the law. If you say to someone, you must pick a color, and the person picks a color complying with the law, and then someone says, ah, now you can be held liable for having picked that color because you didn't pick another color. That is a non-illegal proposition that no state in this country has ever adopted. And why? Because you've complied with the law. The law didn't tell you which color to pick, but the selection of the color did not make a difference in terms of the fact that the law mandated that you pick a color. If they picked white and called it white cat, same problem. Pick green, green cat, same problem. This creates a situation where, and this is where the statute goes, this isn't about yellow cat anymore or YCA. If you hold that compliance with the law, but because the manner in which you choose to comply with the law can give rise to a parent agency, then O'Banner is gone. McDonald's, everyone just assumed McDonald's for a parent agency. Everyone just assumed BP or Amical for a parent agency. Wasn't the O'Banner case more about whether or not the plaintiff had established that he chose that particular McDonald's? Wasn't that really about what they stated? That was the rest of the stunt of that case, which is one of the problems here, of course, that there's no evidence from the plaintiffs that they relied upon the apparent authority allegedly confirmed in Mr. E.Z. Edgar. But when you look at it as the principle of law, which we start with, when you look at it from the jury instructions, we say no parent agency because the conduct of the issue was not volitional, mandated by Daniels. You can debate that. We've had the debate. You can either agree with us or not agree with us. You think this is the jury instructions, but the jury is no longer being asked about a parent agency. They're being asked about a parent agency in a unique medical malpractice council, in hospitals. And the way the instructions were phrased, YCA was treated as though it wasn't holding anyone else out as. It was treated as if. This is like we stopped pure agency. This truly is a pure agency. We're not square. I don't think we have any further questions, I think. We'll permit you some time for rebuttal. Okay, thank you. I was going to say, I think we're way over here today, so. Good morning, Your Honor. This is Tim Tomasik on behalf of Apple East. With the court's permission, I would like to pick up at the agency argument and conclude with our response to counsel's arguments regarding Mr. Ezegu. Yellow Cab is not a passive actor in this case. Throughout this litigation at the trial level and the appellate level, Yellow Cab has improperly cited Daniels and has suggested that it potentially precludes over 50 years of Illinois parent agency law that has been ruled upon and defined by this court, other appellate courts of this state, and, of course, the Illinois Supreme Court. Yellow's position that there could be no agency as a matter of law has been squarely rejected by three judges in the circuit court who recognize that Daniels does not insulate Yellow Cab from liability nor provide immunity on the basis of an apparent agency claim. At trial, we clearly demonstrated that Yellow Cab 160 and its driver, Mr. Ezegu, were the apparent agents of Yellow Cab. We've asked this court to look to the special interrogatory submitted by Yellow Cab in this case. Special interrogatory number 4, did Yellow Cab hold itself out as a provider of taxicab services? Answer, yes. Special interrogatory number 5, submitted by Yellow Cab, did Mark Jacobs know or should have known that Correa Ezegu was not an employee of Yellow Cab affiliation? Answer, no. Special interrogatory number 12, submitted by Yellow Cab, did Mark Jacobs rely on Yellow Cab to provide him taxicab services? Answer, yes. But should this jury not have been told about the regulations in terms of deciding the apparent agency issue? Judge Lynch properly considered the arguments on both sides as to why these witnesses should not be heard by the jury. As we know, the admission and exclusion of evidence is within the sound discretion of the trial court. Judge Lynch, Yellow Cab candidly admitted that their witnesses were going to testify as to what the ordinance meant. They were going to testify as a matter of what it meant and what it didn't mean. They were also going to testify as to what sort of manifestation that the colors and insignia created. So was the judge's decision based upon a review of specific testimony that he considered when deciding whether or not to grant your motion to keep out certain evidence? It was. In pursuant to our arguments in 403, he determined, for instance, that the commissioner from the city of Chicago, Ms. Babbitt, who is essentially an administrative law judge, would be improper to bring her in as a witness to testify as to what the law was or was not because, in one hand, she would be speculating as to what the city would do if they were approached by Yellow Cab with certain questions. Mr. Mulberg was a witness they wanted to testify as to what the ordinance meant and what it didn't mean. Who was he, actually? Mr. Mulberg worked for Checker Cab, which is actually affiliated with Yellow Cab, but he was going to talk about the cab industry and basically say that everyone's an independent contractor and that they're mandated by law. They wanted these witnesses to testify as to what the law was. But he was going to opine about the fact that this particular driver was an independent contractor. He was, and the proper consideration here isn't with Checker or Yellow thought about the ordinance. It's what Mark Jacobs thought about the color, what Mark Jacobs thought about the insignia, what Mark Jacobs thought about the phone number and all his 15 years of experience. And if I could, with the court's permission, I'd like to speak to volitional conduct because counsel spent an awful lot of time arguing here today in the paper saying that Yellow Cab, their conduct in this case, was involuntary. And that's simply not the evidence in this case. I'd like to debunk this position that they were somehow handcuffed by this ordinance and their conduct was involuntary in this case. The jury in this case heard overwhelming evidence of the voluntary conduct of Yellow Cab. One, in selecting a special shade of yellow, which has been on Yellow Cabs for decades in the city of Chicago, that iconic color of yellow. That wasn't selected by the city. So is it different than any other yellow? It is different. All right. And actually, we learned through this trial, the Hertz company originally discovered that yellow, and Mr. Mulgrew, again, as author of proof, testified that it was actually tested in research at the University of Chicago. But they made that decision, not the city of Chicago. That iconic insignia of Yellow Cab, that says Yellow Cab with the ring, that wasn't designed by the city of Chicago. That was designed by graphic design artists hired by Yellow Cab to attract and build a customer base. How long has that emblem been around, would you say? Certainly, I think it's fair to say decades. While the name of Yellow Cab has changed over the years, from Yellow Cab Affiliation, Yellow Cab Management, it's gone through a number of different nominations for reasons I don't think are relevant here. But there's more evidence, I believe, that the jury heard that goes to affirmatively holding out. They want to say there was no knowledge or acquiescence of Yellow Cab. Mr. Ezegu was required to go down to Yellow Cab headquarters in South Wabash and be trained in the Yellow Cab building by Yellow Cab personnel on the dispatch system. Sincerely on the dispatch? I mean, was there training on driving, or was that necessary for him to obtain a chauffeur's license, or was the training limited only to the dispatch service? Justice Codd, that's a good question. There was more. He was taught to be polite and courteous to passengers, and that's something Marc Jacobs always appreciated about Yellow Cab. He was trained to keep a clean cab and to bring his cab down to Yellow Cab for car washes. And we have to keep in mind, they say no volitional conduct. The city wasn't doing all these things. Yellow Cab actually assigned Mr. Ezegu a number that he could punch into the radio so he could receive dispatch messages. The city of Chicago didn't do that. Yellow Cab did. But isn't that part of the statute, though? Isn't that one of the requirements, that the affiliation company has to provide them with a number and that they have to use the dispatch with their affiliation? They had to provide dispatch services, but they take contention with the point, which is an element of parent agency, that they didn't know or acquiesced to Mr. Ezegu being in that cab. They certainly knew and acquiesced through this process. Without this other review of these witnesses who were going to provide testimony, couldn't the defendant be permitted to reference the statutory sections? Couldn't there have been... Did they renew their objection at the time of instructions and ask that the court provide the statutory directives for purposes of even just arguing that those statutes could be noticed? Your Honor, I do believe they preserved the record in that regard, and we believe Judge Lynch properly ruled that the test for parent agency isn't what Yellow Cab believes the manifestation is. It's what Mark Jacobs believes the manifestations to be. But isn't there some relevance to the statutory provisions at all? You're saying there's absolutely no relevance. Tell us why. Let's take a look at what the ordinance requires. And I want to make clear, it's an emblem or name of affiliation. So it's true that they did design an emblem through a graphic design artist that they chose, not the city, that would attract the customer base so they can earn profit through the massive operation that they were running. But what does this ordinance require? It requires a phone number, it requires a color scheme, and it requires an insignia and a radio dispatch service. That's pretty basic stuff. Yellow Cab would have us believe that they wouldn't have all this equipment on their car but for the ordinance. I don't think Yellow Cab was about to turn around and start operating blue, teal, or magenta cars instead of having that winged emblem have an anchor or horseshoe or dolphin on the side of the car. That was their brand. And this ordinance in no way conducted everything that they did. So isn't one of your arguments that this isn't really a matter of being required to do something? That they chose what they wanted as their emblem. And the ordinance wasn't relevant because they were not forced to use this particular emblem that they had. It is not our charge that Yellow Cab is liable for following the city ordinance. It is our charge that they created the appearance, Yellow Cab, with that famed winged emblem that citizens and customers like Mark Jacobs relied upon for good, safe service. And that was going to occur with or without that ordinance. It had been going on here in the city of Chicago for years. And does a parent agency or can a parent agency ever be defeated by what occurs subsequent to entering into the cab? So once you get inside the cab, there is, as I understand it, a hard card or something that identifies the owner or the operator of the cab. Does that have any effect or impact at all on the apparent agency analysis? It does only to the point that it was strenuously and arduously argued by counsel in this case. But that was a question of wait for the jury. One, somebody has already hailed the cab, opened the door and gotten in before they were in the presence of the hard card. But if you look at that hard card, it doesn't say owned by, operated by, independent contractor or anything of the nature. It's a city of Chicago license. And in this particular case, it said Zegus, Inc. This is far different from a thorough consent form in some of the medical malpractice cases that I've held that that's enough to defeat a parent agency. So in this particular case, the jury saw that hard card flown up before them, you know, three by four feet, and determined that that in and of itself did not put Mr. Jacobs on notice of the scare. I'm asking what context the jury was permitted to review the hard card because they weren't permitted to review or to have information with respect to the code. So how does the hard card get introduced? The hard card was introduced, I believe, as defendant's exhibit number one. And it was blown up for opening statement and for direct exam of various witnesses. And it was a large exhibit in front of the jury. It was displayed in front of the jury for them to view. And it was also used during closing argument in this case. I would also like to point out, too, that the phone number, 312 Taxi Cab, that was on the side of the car, the court required a phone number. But 312 Taxi Cab was a marketing and a creative strategy created by Yellow Cab to generate more customers and more profits. And as Mr. Zegu testified during this case, if you called that phone number in 2005, they would pick up the phone and say, Yellow Cab. And I suggest if you called that phone number today as I did this morning, they would pick it up and say, Yellow Cab. That's all volitional conduct on behalf of Yellow Cab, not the city of Chicago. What should the jury have been told about these regulations? What would have been the harm in at least saying that the name, the color, that those things, even the emblem, are something that have to be on the cab pursuant to statute, so that they could argue that they weren't an apparent agent? Because I believe that Judge Lynch properly ruled that that would take the jury down a road of frolic, if you will. We'd have a trial within a trial as to what the law was, what it meant. This was basic information that was on the side of the cab. It wasn't bumper-to-bumper regulation of how they operated the business as they suggest. And there was overwhelming evidence of Yellow Cab's volitional... Was the jury advised or, I mean, they were certainly aware, weren't they, that this cab was not owned by Yellow Cab Affiliation? They were. Did that make any difference here, that they were advised of the fact that Yellow Cab Affiliation did not own this vehicle? I think it resulted in Yellow Cab getting a fair trial. The owner of the medallion, Cornelius Aziga's brother, Matthew Aziga, testified about the fact that he owned the cab, he owned the medallion, that it was Yellow Cab. He also testified that he was required to have the paint and the insignia inspected by Yellow Cab to make sure that it was applied properly  Is it your position that if this was an error, is there still a requirement that the error impacted the verdict? We contend, obviously, there was not an error. Yes, but what is your position as far as if there was an error? It has to be prejudicial, does it not? It does. There was absolutely no prejudice. Would the jury have reached a different verdict if they had been known that the regulations required the name of the cab company, the color, the logo? In our view, they would not have been in any way. Their decision would have been the same in this case because there was overwhelming evidence of Yellow Cab's volitional conduct in creating a brand, in creating an insignia that was iconic and well-known throughout the city, and that the coding of itself, I don't believe in any way, constituted any reversible error in this case. I'm sorry, Justice. But in asserting that the conduct was almost purely volitional, don't we somewhat negate the fact that not all of the conduct was volitional? Because there is something that's required from YCA. So when we say volitional, don't they just get really only half of it, not all of it? Because the code does require them to do something, even with not everything that they suggest. I would argue to this court that some of the conduct on behalf of Yellow Cab was required by law, not all of it. The jury could have easily found, based on the evidence we put, and certainly on the radio training in and of itself, that that was knowledge and affidavits to Mr. E. Zeger being behind the wheel of the cab, and that the fact that they were required to put a color scheme and an emblem or a name on the side of the cab, whether it was required by law, that being not presented to the jury, I don't think it resulted in any prejudice at all. I think what the defense is saying is, and I think both of my colleagues have referenced this, that this case seemed to turn predominant. I mean, this was an apparent agency case. That was your only theory against YCA. You rise or fall on apparent agency, and you make the argument that they, of their own volition, used a certain yellow color. Of their own volition, used a certain logo. Of their own volition, put that phone number on the side. This was all their decision. I think what they're saying is the jury only got to hear your side of the argument. They have an argument that says, okay, yeah, we did that. I don't think that YCA, I didn't see any place where YCA denied any of those things. But they say, but putting them on there were required by regulation. Now, you have your argument. The jury got to hear it. They have their argument. The jury didn't get to hear it. I mean, that's what this comes down to, right? What do you say to that? I say that Judge Lynch properly ruled that bringing in the ordinance into this case, bringing into what the owners, operators, employees of Yellow Cab say the ordinance requires them to do and not to do would be a trial within a trial. The case is about apparent agency, which stems from the doctrine of equitable estoppel. It goes down to what Marc Jacobs believed, Yellow Cab, their holding out of this vehicle as a safely operated, well-maintained vehicle, and his reliance on Yellow Cab for a number of years and certainly being in question to get him from downtown to Hinsdale. And that's what this case was about. But the doctrine of equitable estoppel is clearly inclusive of the notion of voluntary or volitional conduct. And, again, we have plaintiffs being able to present what they believe was volitional conduct but defendants being precluded from offering anything in support of not all of the conduct having been volitional. Well, I think we're all allowed, as lawyers, judges, and certainly jurors, to use our common sense. And that is that Yellow Cab is operating a massive commercial enterprise for profit. That Yellow Cab had been on the streets of Chicago for decades. If Yellow Cab had been yellow, it had a famed insignia with a phone number, and that color, that insignia, that telephone number would be on the side of all those Yellow Cabs with or without that ordinance. And that's why I do not believe there would be any prejudice to the defendants in this case. What about the instructions? The counsel has argued, Mr. Godfrey has said, that these instructions were erroneous, that they are directed to the actual agency. The jury was completely misinformed about the law, that there is no IPI that would have even fit. So what are your responses to that? We have a very strong response to that, Your Honor. First of all, Chapter 50 does direct everyone to 10510 for parent agency. And counsel mentioned the York case on a couple of occasions. I stand before this court able to describe the York case in great detail. Mr. Clifford and I tried that case. We argued that case before this court and the Illinois Supreme Court. And the instruction that we used in this case mirrored our instruction from the York case, although modified to take it out of the medical context. And when we look at the IPI, we need to recognize that the committee is set up of plaintiff lawyers, defense lawyers, and judges who bring their collective thoughts in developing the instructions that are not based on case law or that parent's case law, but are actually conversational and easy to understand. And the Supreme Court Rule 239 states, whenever an Illinois parent jury instruction is available in a civil case, the IPI instruction shall be used. And in this particular case, Judge Lynch at page 1237 in the record did a side-by-side analysis. First of all, he was giving 28 instructions. He described it as the kitchen sink. He was confused. We were confused. The court was entirely overburdened with the number of instructions. But do the apparent agency instructions in medical male cases mirror the law regarding the elements of the parent agency or not? They do when properly modified, as we did. And counsel talks about the York case and there being differences with the parent agency in medical cases. And here are the two differences. Well, my question, I guess, is this. Is there really a difference between the parent agency, depending on who the defendant is, a doctor or a cab driver? I would submit to this court, in the context of our case against yellow cab, the parent agency and elements of the parent agency are no different than a patient walking into an emergency room at Rush or Northwestern. It is exactly the same. And that is the law and elements of the parent agency as you laid out in our instruction. And they talk about the Pluie case and that the instruction should have mirrored the Pluie case. The three prongs of the parent Pluie. Judge Lynch did a side-by-side comparison between those prongs of page 237 and the instruction that was given, which, by the way, was yellow cab instruction number 5. And it was also over-objection because they broke it down into three parts. But that was their instruction at the time that it was submitted. But Judge Lynch recognized that the rules in Pluie were not conversational. They were not IPI. They were rules of the parent agency taken from case law and the restatement. If you go back to Gilbert, York, or Banner, through the cases that recently came down from the First District, you will find those three prongs of the parent agency in all those cases. But there is no case in the state of Illinois that says those three prongs ought to be in the jury instruction for a parent agency. The only direction we're given is the direction from 1 to 510 on how the instruction should be presented to the jury. And it was properly modified out of the medical context. First, that yellow cab affiliation, Inc., held itself out as a provider of taxicab services. Is that an accurate statement of the parent agency, that the principal holds itself out, not that it cloaks the independent contractor with the parent authority, but that it holds itself out? We believe it is because neither Mark Jacobs or Mr. Ezego knew why. In essence, Mr. Ezego was yellow cab. And he went to that cab seeking taxicab services. But help me out. The parent agency, prong one, the defendant, the person being sued, is claimed to have taken volitional conduct, cloaked the non-agent with the parent authority. They say they took some action. But they don't do it to cloak themselves with authority. They're being sued in a derivative capacity. Is it correct to say in the jury instruction that they have to fight with the yellow cab affiliation? The parent affiliation held itself out. Itself? What does that mean? Are we asking the question whether they cloaked that car with the authority and maybe by extension the driver of the car? That's exactly what we're saying. And this language, again, mirrors 10510 out of the medical context. It would be no different than an emergency room. In the medical context, it would be, Rush held itself out as a provider of medical service or emergency room department services. Furthermore, I would point out that the defendants in their papers cite to the Stutt case, I believe it's in their flag papers, to a decision of the Illinois Supreme Court written by Justice Kilbride where an actual IPI instruction was given but later found to be error. It was a medical malpractice case where it was a judgment against a hospital. In that particular case, Justice Kilbride promptly emphasized that all the instructions must be read together and there must be determination as to whether they comprehensively charged the jury with the issues in that case. And in the Stutt case, cited by the defendants, the Supreme Court ruled that reversal is warranted if the error resulted in serious prejudice to the hospital's fair right to trial. In that particular case, reversal was not warranted as the error did not result in serious prejudice to the hospital's right to a fair trial. And I submit to this Court that we properly followed the IPI. We properly stayed the law of the parent agency. I would also point out to the Court that two times in the defendants' reply brief, they cited to the Gilbert case once in their opening brief. Gilbert is predicated upon Restatement II of Agency 267, which we actually cited on pages 28 and 29 in our brief. And that states the law of the parent agency in substantially the same language as you would find in Illinois law. And it's updated annually. And the restatement actually cites to Gilbert and Petrovic as authoritative cases from Illinois. They provide illustrations as to how a parent agency is used in the proper context. Illustration number one. Claim that the taxi cab company, supporting to be the master of the drivers of the cabs, in fact, enters into an arrangement with the drivers by which the drivers operate independently. A driver negligently injures T, a passenger, and also B, a person on the street. T is not liable to B, the passenger on the street. But if found that T, the passenger, relied upon the taxi cab as one person to save drivers, P is subject to liability in court action in an action court pursuant to parent authority. And that substantially is a parent agency as related out in our instructions. I was not asked the court to look at it. It was recently updated as of October 15th. What about the special interrogatory that was refused, the second one? Unless you want to continue with what you're... We have some time constraints here. Special interrogatory that was tendered by Mr. Azizu was improper in its form. Throughout the reply brief, Mr. Azizu spent nearly 18 pages, I think, properly stating what the law is in regard to the statute, requiring special interrogatories, but when they're in proper form. We objected because this particular interrogatory was improper in form, and that it simply stated, Will Mark take us actions on the night of the accident, the sole proximal cause of plaintiff's injuries? His night started at 7 p.m. There was cross-examination on directions from Lakeshore Drive to I-55 to 294, whether he gave directions soon enough, whether he gave directions at all. He was on his cell phone, so they alleged. She had been on her cell phone. She had not been on her cell phone. And then Mr. Azizu argued that Mr. Jacobs yelled at him. And Judge Lynch agreed and properly ruled that it was not in proper form and that it was too vague and ambiguous because the rule requires that a special interrogatory be given, but it has to be in proper form. It can't be misleading. It can't be ambiguous. It can't be more than one sole proximate cause. But there's one more problem underlying their position here. A special interrogatory must test the verdict. The defendant in this case, at no time, tended to trouble for a sole proximate cause instruction, actual instruction to be tested. The jury wasn't charged to consider whether Mark Jacobs, the plaintiff, was a sole proximate cause in the context of an IPI instruction. Therefore, I think that disposes of this issue entirely, on top of the fact that Judge Lynch's determination that it was improper was correct. I'd also point out, because the question was asked, and I'm reading from page 1396 of the record, Judge Lynch, in this form it's refused. I'm not saying you don't have a proper special interrogatory that you've come up with. There are some concerns about it right now, but if you don't come forward with one, then you're not accepting the invitation to do so. And Mr. Mordini responded, I hear you loud and clear. He never presented another special interrogatory. If I may have a moment, I'd just like to speak to the Daniels decision. Could I just keep you on that for a second? So Mr. Butler points to the fact that the jury did have an instruction as to what the defense arguments were, what the two actions were that were at issue. The belated signal that, hey, that's my exit, and the fact that he yelled and would have startled the driver. I mean, what's so vague about this? What doesn't the jury know with that special interrogatory that they should know? Real conduct, yelling at the driver, not giving direction, suiting up, being on the cell phone, when? I mean, address what Mr. Butler said. He said the jury had the two things that the defense was claiming, and I think the 2001 instruction said, which I admit I have not seen. I have not reviewed that in the record. But his contention is they knew exactly what the defense was saying. They knew exactly what two things they were talking about with regard to the plaintiff's potential. That is a fair question, and I believe Mr. Mordini in trial argued sole proximate cause based on those two issues to the jury and argued those facts very thoroughly. This wasn't a basis for sole proximate cause instruction in this case, and on the IPI side they failed to submit a special interrogatory on the issue that was proper. But Mr. Mordini got to argue his entire case in that regard to the jury, arguing that those acts in and of themselves were enough. But you're saying that this was vague. The second special interrogatory was vague. I'm trying to pin your doubt on what was vague about it. What didn't the jury know from that that they should have known? What more specifically could have been said? At what point? At what point? Like yelling at the driver right before exiting from the highway, not telling him two miles further back down I-394 to get over to the right, being on the cell phone, not communicating with the driver. His evening started at 7 p.m. The action was at 9.48 p.m. And this states, actions on the night of the accident. There can only be one sole proximate cause. This was very ambiguous and confusing because it misled the jury and they would be guessing as to what the sole proximate cause was. It could have been any one of a number of things. And I think the failure to tender sole proximate cause instruction on the IPI side disposes of this issue. Did you argue that in your brief? Did you make that argument in the brief? We did not. All right. I didn't think so. I was just curious. All right. If I may, and I know we're short on time, I'd like to make one point on Daniel's case because I think it's so important to this case. Yes. Daniel simply was not a case that addressed actual agency in the context of the ordinance. There were three different sections to that opinion. Section A in bold was actual agency in the context of the ordinance. Section B was actual agency in the context of a classical analysis of factors sufficient to raise a question for a jury. So the plaintiff took the very aggressive position that the ordinance created agency as a matter of law. And the court ruled in Part 1A that that was incorrect, that compliance with the ordinance did not create agency as a matter of law. If Yellow Cab's position was correct, that Daniel stands with the proposition that there can be no agency whatsoever when a statute is involved, and I think this goes to the question we talked about earlier, that Daniel's court would not have gone on to Part B of that analysis, which was a classic analysis of the control factors present or not present giving rise to agency. And in that analysis, the court looked to what Yellow Cab did and did not do and determined that since they did not own the car, pay for insurance, pay for gas, pay for tolls, control the hours of operation, withhold taxes, store the vehicle, they could operate whenever they wanted, they did not have control. If Daniel's was intended to preempt agency in the context of the ordinance, they never would have gone into Part B of that opinion, which I submit to this court is the longest part of the opinion, by at least 600 words. And if the defendant's position was correct, was correct, that Daniel's preempts actual agency and apparent agency, that Daniel's court never would have conducted a classic analysis of the factors that would give rise to actual agency outside of the ordinance. Thank you. Mr. Butler? Briefly, I want to address the issue that Mr. Tomasik came up with. He was talking about, in regards to the special interrogatories, facts that were not charged in the charging document, the 2001 instruction. Noble dealt with that issue and said that even in absence of the jury instruction, you have to assume the trial is capable of basic human logic, that they're going to assume that the issues that they're talking about in the use of the collective term relate to the relevant time and place frame. Was the jury instructed about sole proximate cause? There was no sole proximate cause just as in Snyder. There was no sole proximate cause in that case either. The sole proximate cause, it does not matter. I don't think there's any decision out there that says that. If they weren't really told about the sole proximate cause, they weren't instructed, what were you testing? I'm not sure I understand how a jury tests. You explain it to me. They were instructed on what proximate cause was, and in that instruction they talk about the only proximate cause, and I don't know anybody who has this function in their brain that doesn't know what the word sole means, and if that's the basis of saying that's confusing, I don't know how any interrogatory will ever be submitted, and if we take this position that we're going to resist the right of the party so much, then the statute means nothing. Unless there's any other questions, I'll allow my time to Mr. Gottfried. All right. Thank you. Mr. Gottfried. I'm going to start with what Daniels means and does not mean. At the end of Section B, let me read you what Daniels' ultimate and ultimate holding is, because it's the basis on which we think this case was submitted in error for the jury to begin with. The online courts have previously refused to find an agency relationship based on defendants' attempts to comply with or set standards in conformity with a statute. That has been our point from day one. So, we then go to what was the original conduct here. The selection of yellow. All right. So let's say they selected green. They'd be making the same argument. Let's say they selected purple. They'd be making the same argument. Compliance with a statute cannot constitute, under the laws of our country, a violation of common law, give rise to common law liability. But if it somehow can give rise to a parent agency notwithstanding the law in this state, then your Honor's question and your Honor's question about what the jury was instructed, there is no relationship. Whether it's summary judgment, whether you look at Alger or Brooks, whether you look at O'Banner, it is correct that they argued York. But York is a very interesting opinion because they are trying to do in York what they persuaded the Supreme Court was being wrongfully done below. York was about Gilbert being emasculated by including the standards, the three-part test of O'Banner, into non-hospital situations. And they won that. They probably won that. Because Gilbert has said in hospital situations for medical malpractice the test is the following. They're not all trying to take the unique hospital situation test and transform that into a non-hospital context. And that's why I read your Honor, Justice Ellis, that's why I read the instructions. The first instruction doesn't ask about a parent authority. It asks about YCA. The second instruction doesn't ask about whether or not there was knowledge and reliance upon the parent authority created. It asks about Mr. Jacobs' alleged belief. There's nothing to do with the parent authority. It fuses together actual agency and apparent agency. And there's an end run. May I ask you this? Yes. The IPI that talks about or explains apparent agency in the physician hospital setting, do you agree that that actually or accurately describes the law of apparent agency or not? In the hospital setting, yes, because that's what the Supreme Court says. No, not in the general apparent agency because O'Banner is the Supreme Court and it says something quite different. So you're saying that these modifications that were used in this case completely, they bear no resemblance whatsoever to the apparent agency IPI instructions for the physician? No, they are based entirely upon the physician instructions. I understand. But they bear no relationship to what they should have. So if you take a look at O'Banner, Choi, Oliver, Brooks, and the elements as well as A359, which is the elements that the court below denies summary judgment on, if you look at those three elements and then you measure the IPI section 105.10, look at those elements, they're not remotely the same. In terms of the verdict, is it your position that if the jury had been told about the statute, that the cab affiliation company had to put the yellow on the cab, they had to put the name on the cab, they had to put the emblem on the cab, that that would have resulted in a different verdict? Absolutely. I don't have to speculate. Go to page A313 of the appendix, which is transcript page 913. The jury asked a question in the middle of the file. Well, that doesn't really mean that their verdict was going to be different. But listen to the question. I read the question. Okay. The point is, my experience, I've tried a lot of jury questions, a question like this coming in the middle makes a difference. You not only know that, A, they asked the question, and B, Mr. Clifford and team vigorously fought to keep the question from being answered, because they knew that the answer was, as your Honor said, tells the whole story. Remember, this is an operational conduct. The jury was following a closing argument. This is an operational conduct. Yellow, phone number, emblem, they weren't told that this was mandatory. They weren't told that they could not put anything else on the outside of the cab, like independently owned and operated. Shortly after this verdict, the city changed its regulations. Yeah, we're aware of that. Is there any IPI that talks about volitional versus non-volitional conduct in the law of a parent agency? No, not that we could find. Not that was cited. Did you propose something along those lines, even though the court had already said that it was not going to permit? Yes, we proposed fully, the elements and fully as an instruction. And what was that? Give us a short, what did your proposed instruction say regarding volitional versus, you know? Well, I'm sorry, it didn't describe volitional versus non-volitional. Okay. If that's what the question is. We were using a fully three-part test that was essentially repeated here. Yeah. But there was no definition specifically offered as to what's volitional versus non-volitional, because we weren't allowed to speak. That is, YC was not allowed to speak about what was non-volitional. In the restatement that both of you have talked about, is there any provision in there that suggests this idea that you're talking about non-volitional conduct? We've cited it in our brief that there's a different restatement section. There's a general principle of law that compliance with a statute or a code cannot subject you to common law liability. Why? Because it's a Byzantine Test 22. You comply with the statute, but you have common law liability, or you don't comply with the statute, you have no common law liability, but you have statutory liability. A few more points of significance. The SDA itself was formed in 2005, I think. The affiliations were created in 1997. So this yellow cap and this emblem thing, this goes back to the code required to select a color. They selected yellow. But that cannot be illegally distinguishable, or the distinction in the law makes any difference in terms of compliance with the code. In terms of the hard card, the hard card that they complain about, which is notice, that was specified by the city, what you could say or not say. It's notice after you're already in the cab. It's notice after you're already in the cab. You're already driving away. It's true. But, again, the city did that. And that's why the post-regulation change is so important, because it shows the city wanted to make clear. In terms of the question, Judge Ellis, should they have been told the whole story? Absolutely. What's the harm in letting the jury make its own conclusions here? This is a jury trial. This should have all the facts. We don't think it should have gone to the jury to begin with, but having gone to the jury, the jury should have been told that this was not volitional conduct. And certainly in the closing argument, if you read the closing argument carefully, the impression is strongly left that all of this was YCA. All of this was YCA's decision. Nowhere did the jury get told the answer to the question posed by the juror, which was no, they had to join affiliation. No, YCA had to choose a color. No, YCA could only put certain things on the cab. No, YCA couldn't put other things on the cab. None of that was told to the jury. But that's the truth. If jury trials are for the purpose of defining and discerning the truth, then the entire truth, the whole truth, should have been told to the jury, not the one-sided truth, which lays a false impression of facts. In terms of the York case and the jury, what the jury was instructed, there was no answer, I submit, to simply repeat, well, we followed Gilbert in York. You're going to respond, the first instruction, plaintiffs must prove that YCA held itself out as a provider of taxicab services. What in the world does that have to do with the price of tea in China in a parent agency case? It should have been, as what Oliver Brooks, employee, said, plaintiff must prove that defendant held another out. If they conferred a parent authority in another. They had melded together actual agency and a parent agency with instructions that apply in a unique situation not present here. And that's true for all three instructions. So when you step back, one, should the jury have been told about the code if it's a jury question? Absolutely, because that's the whole story. Otherwise, the jury is led to believe, in closing you'll see it, that YCA's decisions were entirely volitional. They weren't volitional. They complied with the code. Two, Daniel holds that conduct which is compliant with the code can not give rise to civil liability, common law liability. That's why they say in this case, at the threshold, it should never have gone to the jury. All the conduct that they were pointing to was volitional. Third, in that regard, the question about being polite and safety and all of those things, that's required by the code, too. There are these rules. A-158, the appendix. 305.08, defined it right there. The testimony the jury was not allowed to hear was, this is a regulated industry from harm less sold in tobacco or liquor. YCA was held liable for conduct compliant with the code. But if you disagree with that, we respectfully disagree. At a minimum, it should be entitled to present a defense to the jury with all the facts and with proper jury instructions. And the jury instructions, as given, were not proper. The jury instructions do not square with O'Banner, Cloy, or Oliver O. Brooks. The threshold principle does not square with Lanier in the case law, which holds that as a matter of law, YCA cannot be held liable for conduct which is not volitional. Unless the court has any further questions, we would ask a reversal in the judgment as a matter of law. If the court disagrees with that, then we'd ask for a reversal with proper instructions so that the jury hears all the evidence, the whole truth, and nothing but the truth. Any instructions that match the reality of what the cases say for parent agency, non-instructions which are limited only to a hospital setting in an emergency situation. Thank you very much. I appreciate the time. And the court has been very generous with the time, so thank you. All right. Well, we thank all of the attorneys today for their comments. And we will take this matter under advisement.